**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| MARY MARGARET SKIBSKI, | CASE NO. 3:23-CV-01554 |
| Plaintiff, | |
| vs. | JUDGE JAMES R. KNEPP II |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Mary Margaret Skibski ("Plaintiff" or "Ms. Skibski") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

### I.     Procedural History

Ms. Skibski protectively filed her DIB application on April 19, 2021, alleging disability beginning December 1, 2016.[1]  (Tr. 18, 258.)  She alleged disability due to congestive heart failure, pulmonary conditions, sleep apnea, learning disabilities, and trouble concentrating.  (Tr.

---

[1] Ms. Skibski filed prior applications for DIB and Supplemental Security Income ("SSI") in May 2012, which were denied in June 2015.  (Tr. 18, 259.)  She was later awarded SSI benefits as of April 2021.  (Tr. 44, 46.)

1

86, 94, 250.)  Her application was denied at the initial level (Tr. 109-17) and upon

reconsideration (Tr. 136-44).  She then requested a hearing.  (Tr. 145-46.)

On September 29, 2022, a telephonic hearing was held before an Administrative Law

Judge ("ALJ").  (Tr. 18, 35-67.)   The ALJ issued an unfavorable decision on November 16,

2022, finding Ms. Skibski had not been under a disability from December 1, 2016, through June

30, 2017, the date last insured.  (Tr. 15-34.)  Plaintiff requested review of the decision by the

Appeals Council.  (Tr. 195-96.)  The Appeals Council denied her request for review on June 26,

2023, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)  Plaintiff

filed the pending appeal on August 9, 2023 (ECF Doc. 1), and the matter is fully briefed (ECF

Docs. 8, 11, 12).

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Skibski was born in 1962.  (Tr. 200.)  She was 54 years old as of her date last insured

(Tr. 45, 86) and 59 years old at the time of the hearing (Tr. 45).  She was single and had no

children.  (Tr. 691.)  She completed four years of college (Tr. 45-46, 252) and had past work as a

call center operator and substitute teacher (Tr. 46-49, 238).  She worked as a substitute teacher in

2017, 2018, 2019, and 2020.  (Tr. 46.)

### B.  Medical Evidence

#### 1.  Relevant Treatment History[2]

On June 15, 2016, Ms. Skibski presented to Lynn Blakeslee, NP-C, for a cardiology

follow up.  (Tr. 641-42.)  She reported that she was generally feeling "very well."  (Tr. 642.)

---

[2] While Plaintiff summarizes medical records that pre-date the relevant period, including records dating back to
2014 (ECF Doc. 8, pp. 4-6), the undersigned's summary of Ms. Skibski's treatment history is focused on medical
records from the relevant period—2016 through 2017.

She reported no anxiety or depression.  (*Id*.)  Examination findings revealed good muscle tone and strength and no edema. (Tr. 642.)  Ms. Skibski's lungs were clear to auscultation with no wheezes or rales and good air entry.  (*Id*.)  Her cardiac examination was unremarkable.  (*Id*.)  NP Blakeslee continued Ms. Skibski's medications for atrial fibrillation and congestive heart failure.  (Tr. 641.)  Ms. Skibski was advised that she could take an extra Lasix tablet for swelling and edema when needed.  (*Id*.)  She was instructed to continue to follow a low sodium diet and call if she experienced more than a three-pound weight gain.  (*Id*.)  She was also instructed to follow up with her cardiologist Ghiath Yazji, M.D., in four months.  (Tr. 641-42.)

On October 12, 2016, Ms. Skibski returned to Dr. Yazji for a cardiology follow up.  (Tr. 638-40.)  She complained of edema, but denied chest pain, claudication, shortness of breath, palpitations, dizziness, fatigue, syncope, and orthopnea. (Tr. 639.)  She reported no anxiety or depression.  (*Id*.)  On examination, she was alert and in no acute distress.  (*Id*.)  Her lungs were clear to auscultation with no wheezes or rales and good air entry.  (*Id*.)  Her cardiac examination was unremarkable.  (*Id*.)  Her BMI was 44.95.  (*Id*.)  She had good muscle tone and strength, but 2+ edema and skin discoloration in the extremities.  (Tr. 639-40.)  Dr. Yazji diagnosed atrial fibrillation, cardiomyopathy, congestive heart failure, and edema, and noted that Ms. Skibski continued to refuse anticoagulation for atrial fibrillation and was not using an ACE inhibitor for her cardiomyopathy because of side effects.  (Tr. 638-39.)  He also noted that she had not used compression stockings provided for her edema in the past but was more receptive to using them.  (*Id*.)  Dr. Yazji prescribed compression stockings, continued Lasix and Klor-Con for congestive heart failure, advised Ms. Skibski to take an extra Lasix tablet for swelling or edema as needed, and ordered an echocardiogram.  (Tr. 638.)

On October 25, 2016, Ms. Skibski presented to Dean Bernardo, M.D., for follow up regarding sleep apnea. (Tr. 582.) Dr. Bernardo noted that Ms. Skibski's heart rate was in the 130s and 140s during her last visit, which was concerning for atrial fibrillation, but that she had declined immediate intervention. (*Id*.) Ms. Skibski reported that she had seen her cardiologist since that visit and was back on her medications. (*Id*.) She denied a rapid heart rate, chest pain, or musculoskeletal joint pain or weakness. (*Id*.) She also denied anxiety, depression, mood swings, or any psychiatric condition. (*Id*.) Examination findings were unremarkable. (Tr. 583.) Dr. Bernardo recommended that Ms. Skibski start using a CPAP. (*Id*.)

An echocardiogram performed on October 26, 2016, showed: moderate-severely impaired overall left ventricular function with an ejection fraction between 30-35%; moderate mitral regurgitation; and mild tricuspid regurgitation. (Tr. 650-651.)

On January 22, 2017, Ms. Skibski presented to St. Anne's Mercy Hospital's emergency room, complaining of a cough and shortness of breath. (Tr. 416-21.) She reported an earache that had spread into her chest. (Tr. 417.) She said that her symptoms were continuous, and nothing seemed to make them worse or better. (*Id*.) She denied fatigue, chest pain, arthralgias, syncope, and confusion. (*Id*.) She was not anxious or nervous. (*Id*.) On examination, Ms. Skibski had a normal heart rate and rhythm, normal breath sounds with no wheezes or rales, and was in no respiratory distress. (Tr. 418.) She had normal range of motion. (*Id*.) Her mood, affect, and behavior were normal. (*Id*.) A chest x-ray revealed cardiomegaly and mild perihilar vascular prominence and possible early congestive heart failure. (Tr. 418, 511-12.) She improved after she was given IV Lasix. (Tr. 419.) She was also given an antibiotic for a suspected sinus infection. (*Id*.) She was discharged with a diagnosis of congestive heart failure and instructions to follow up with her primary care physician. (Tr. 420.)

4

On April 12, 2017, Ms. Skibski presented to NP Blakeslee for a cardiology follow up. (Tr. 635.)  She reported chronic lower extremity edema, but denied any worsening.  (Tr. 636.)  She denied syncope, dizziness, myalgias, weakness of muscles, muscle aches, shortness of breath or chest pain at rest or with exertion, palpitations, fatigue, and memory problems.  (*Id.*)  She reported walking one-quarter mile to one mile daily without symptoms, and said she was attending weight watchers without losing weight.  (*Id*.)  On examination, her BMI was 45.73, her heart rate and rhythm was irregular, and she had 2+ edema in both lower extremities with chronic skin changes and dry skin.  (*Id*.)  Her lungs were clear, and her breathing was non-labored.  (*Id*.)  Her diagnoses included atrial fibrillation, congestive heart failure, and edema.  (Tr. 635.)  She continued to decline anticoagulants but was instructed to continue daily aspirin and Diltiazem HCl for atrial fibrillation.  (Tr. 635-36.)  She reported that she had not started wearing the compression stockings following her last office visit, but requested and received a new prescription.  (*Id*.)  NP Blakeslee continued her Lasix and Klor-Con prescriptions and recommended that she exercise and follow a low fat and low salt diet.  (*Id*.)

On July 12, 2017, Ms. Skibski had updated chest x-rays taken.  (Tr. 498-500.)  The impression from the x-rays was congestive heart failure decompensation with pulmonary edema and moderate right effusion.  (Tr. 499.)

Ms. Skibski did not see her cardiologists again until 2019, when it was noted that she had previously refused anticoagulation and cardiac work-up.  (Tr. 357, 632-34.)  On June 18, 2019, she reported to Dr. Yazji that she had lost her insurance and was unable to get her medications.  (Tr. 633.)  She also reported gaining a significant amount of weight and having a significant amount of edema.  (*Id*.)  Her BMI was 49.49, but examination findings revealed good muscle tone and strength, no edema, and clear lungs.  (Tr. 633-34.)  She did not think that the diuretic

she was buying from the pharmacy was working.  (Tr. 633.)  She had not been seeing her primary care physician regularly.  (*Id*.)  Dr. Yazji noted that Ms. Skibski was very pleasant, but it was difficult to communicate with her as she did not provide straight answers.  (*Id*.)

### 2.    Opinion Evidence

#### i.    State Agency Psychological Consultants

On December 13, 2021, state agency psychological consultant Karla Delcour, Ph.D., completed a review at the initial level.  (Tr. 89.)  She found there was insufficient evidence to evaluate Ms. Skibski's psychological conditions during the relevant time period.  (*Id*.)  She also found that no medically determinable psychological impairments had been established.  (*Id*.)  On March 16, 2022, on reconsideration, state agency psychological consultant Robyn Murry-Hoffman, Psy.D., affirmed Dr. Delcour's findings.  (Tr. 97.)

#### ii.    State Agency Medical Consultants

On July 30, 2021, state agency medical consultant Mehr Siddiqui, M.D., completed a Physical RFC Assessment.  (Tr. 90-92.)  Dr. Siddiqui opined that Ms. Skibski had the following physical residual functional capacity: she could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; she could stand and/or walk six hours in an eight-hour workday; she could sit six hours in an eight-hour workday; she could never climb ladders/ropes/scaffolds; she could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; she would need to avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity; she would need to avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, gases, and poorly ventilated areas; and she would need to avoid all use of moving machinery and exposure to unprotected heights.  (*Id*.)

State agency medical consultant James Cacchillo, M.D., agreed with Dr. Siddiqui's Physical RFC Assessment on reconsideration on March 20, 2022.  (Tr. 98-100.)

### iii.    Consultative Psychological Examiner

On November 17, 2021, Daniel K. Watkins, Ph.D., conducted a consultative psychological evaluation.  (Tr. 689-97.)  Ms. Skibski reported that she had a learning disability and congestive heart failure.  (Tr. 691.)  She also reported that she was recently dismissed from her job as a substitute teacher.  (Tr. 691-92.)  She believed they "retired" her because she was having a hard time learning the new computer system.  (Tr. 692.)

Ms. Skibski reported that she suffered from depression in the past, but she said she was "'healed by the Holy Spirit' about 30 years ago." (Tr. 692.)  She also reported that she had taken "an unspecified psychoactive medication 'years ago,'" but the medication was discontinued due to side effects.  (*Id*.)  She said she was in psychotherapy years before and was currently attending psychotherapy with a social worker "'to help [her] through . . . stuff.'"  (*Id*.)  She reported past treatment for ADHD for which she said she took an unspecified medication for a couple of months.  (*Id*.)  She did not know why the ADHD medication was discontinued.  (*Id*.)  She had never been hospitalized for psychiatric treatment.  (*Id*.)

Ms. Skibski reported that she lived independently, performed her own housework, drove herself, and could manage money.  (Tr. 692.)  However, she was supported financially by family members.  (Tr. 695.)  She spent time with friends and went on walks for recreation.  (Tr. 692.)  She used to volunteer helping with dogs, but no longer did so.  (*Id*.)

On mental status examination, Ms. Skibski was observed to be adequately dressed and groomed.  (Tr. 692.)  Her cooperation was fair, and her motor activity was unremarkable.  (*Id*.)  She complained of pain, but did not appear to be in obvious pain and was ambulatory without

use of an assistive device.  (*Id*.)  Her eye contact was good, but she "had a lot of difficulty coming to the point and giving a straight answer" and she was "guarded and reluctant to answer" at times.  (*Id*.)  Dr. Watkins reported having no problems understanding Ms. Skibski's speech, but indicated she was circumstantial and tangential and had a difficult time getting to the point. (Tr. 693.)  Dr. Watkins had to frequently redirect her.  (*Id*.)  Her mood appeared labile.  (*Id*.) She was irritable at times and was frequently weepy during the evaluation.  (*Id*.)  Her affect and manner were congruent with her mood.  (*Id*.)  She reported having crying spells every other day and said she was "not depressed, just sad."  (*Id*.)  She did not have feelings of hopelessness, worthlessness, or inappropriate guilt.  (*Id*.)  She was not anhedonic.  (*Id*.)  She reported a good appetite, but said she had difficulty sleeping.  (*Id*.)  She denied suicidal and homicidal ideation. (*Id*.)  Ms. Skibski reported being anxious recently and concerned that her landlord's partner was trying to poison her.  (*Id*.)  She denied hallucinations.  (*Id*.)  She denied "thought broadcasting or insertion," but stated the "Holy Spirit gives me a profile of who you are."  (*Id*.)  Dr. Watkins did not feel that Ms. Skibski was responding to internal stimuli during the evaluation.  (*Id*.)  She was able to identify the current and immediate past presidents and historical figures.  (Tr. 694.)  She was able to recall three unrelated words immediately, and one of three after three minutes.  (*Id*.) She was able to correctly add four to five, subtract six from 10, divide 30 x 6, and multiply $.25 by six.  (*Id*.)  She was not able to correctly perform serial seven subtractions from 100.  (*Id*.)

Dr. Watkins observed Ms. Skibski to have poor insight.  (Tr. 694.)  He found her reality testing to be impaired and her judgment skills to be "minimally adequate to allow for independent living, and for some work-related decision-making."  (*Id*.)  He felt that her judgment skills appeared "adequate to allow for participation in a well structured treatment program," but

also felt that she "would probably require significant external assistance to access and sustain such treatment." (*Id.*)

Dr. Watkins diagnosed Ms. Skibski with unspecified schizophrenia spectrum and other psychotic disorder. (Tr. 694.) He felt that her prognosis was fair with appropriate psychiatric treatment, but that her prognosis was marginal to poor without such treatment. (*Id.*) In summary, Dr. Watkins noted that Ms. Skibski's history and presentation were consistent with unspecified psychosis with some probable paranoid delusions, mood lability, and associated anxiety, as well as signs of formal thought disorder; he explained that she was under the impression that her landlord's girlfriend was trying to kill her. (Tr. 695.)

Dr. Watkins then provided the following functional assessment:

***Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.***

Claimant retains some capacity to understand, remember, and carry out concrete or abstract instructions, albeit inconsistently.

***Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multistep tasks.***

Claimant had trouble staying focused today. She was circumstantial, tangential, and had difficulty sustaining attention and focus. She had difficulty giving coherent answers. She does indicate that she can perform concrete multistep household tasks adequately, however. Overall, I would anticipate at least moderate limitation in this area.

***Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.***

Claimant denies any history of significant difficulty in this area, although she does express some fear of others. My expectation is that she might in her current condition experience some difficulty in this area due to paranoid ideation.

***Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.***

> In her current condition, the claimant does not appear capable of coping with typical work pressures. To repeat, there is some chance that she might be able to improve with appropriate psychiatric treatment. My understanding is that, at present, she is participating in counseling, but is not seeing a psychiatrist.

(Tr. 695-96 (emphasis in original).)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

Ms. Skibski testified in response to questioning by the ALJ and her counsel at the hearing on September 29, 2022.  (Tr. 44-60, 62.)   The ALJ explained to Ms. Skibski that she would need to focus on the period of June 2016 through June 30, 2017, her date last insured.  (Tr. 42-43.)

Ms. Skibski testified that she was living in the upstairs unit of a duplex in 2017.  (Tr. 51-52.)  When asked if she had problems with stairs, she said "Yes, big time.  I fell down stairs, too."  (Tr. 52.)  She said she started wearing compression socks back in 2016 and 2017 to help with issues she was having with her legs.  (Tr. 54-55.)  She said she was not wearing them at the time of hearing due to lack of money.  (Tr. 54.)

Ms. Skibski said that her weight in 2017 affected her ability to do things.  (Tr. 54.)  For instance, it was difficult for her to bend over and trim her toenails.  (*Id*.)  However, she had a dog in 2017 that she took for walks when she was able to.  (Tr. 53.)  She also volunteered at a dog rescue, spent time with friends, and attended church.  (Tr. 53-54, 56-57.)  She said she was unable to kneel at church due to problems with her knees.  (Tr. 57.)

Ms. Skibski said she had no problems with students or teachers when she was working as a substitute teacher in 2017.  (Tr. 52.)  She was able to manage her finances and count correct change at the store.  (Tr. 52-53.)  She did some reading, but only "small stuff, nothing big," because of her learning disability.  (Tr. 57.)  She was able to perform household chores in 2016 and 2017, but not as well as she had been able to in the past.  (Tr. 56.)  She estimated being able

to walk a couple of yards at a time, after which she would have to rest for two or three minutes before walking again.  (Tr. 59.)  She estimated she was able to lift about 10-15 pounds.  (Tr. 60.)

Ms. Skibski said that she was having some psychological symptoms in 2016 and 2017, and was undergoing counseling "[h]ere and there with -- kind of like off and on, here and there." (Tr. 55.)  When asked that kind of symptoms she was having, Ms. Skibski said she was "[j]ust not feeling good about [herself] and not being able to do all the things [she] used to do."  (*Id.*) When asked if she had mood or anger issues in 2016 and 2017, she replied: "Angry with myself and not taking better care of myself and then listening to negative people put me down and then just realizing all that, I blame myself more so than anybody."  (Tr. 59.)  She also said she had problems concentrating and focusing.  (*Id.*)

Ms. Skibski was also having cardiac symptoms during 2016 and 2017.  (Tr. 55.)  She said that she had both physical and psychological conditions in 2016 and 2017, but her heart issues affected her the most.  (Tr. 58.)  She was taking medications that caused her to cough and to "feel kind of woozy and kind of like [her] body [was] swaying everywhere," and it was hard for her to bend over to pick something off the ground because she did not know if she was going to fall over.  (Tr. 56.)  She indicated that her congestive heart failure was a very serious condition, which was made even worse by the fact that she had pneumonia fairly often, including during 2016 and 2017.  (Tr. 58.)  She also said had sleep apnea during that time.  (Tr. 59.)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 60-66.)  The VE testified that Ms. Skibski's past relevant work as a substitute teacher was classified as teacher aide II, a light, semi-skilled position, and was performed by Ms. Skibski at the light level.  (Tr. 62-63.)

In response to the ALJ's first hypothetical, the VE testified that a hypothetical individual of Ms. Skibski's age, education, and work experience and with the functional limitations described in the ALJ's RFC determination (Tr. 24) could perform both Ms. Skibski's past work, teacher aide II, and representative positions in the national economy such as: marker, inspector and hand packager, and office helper.  (Tr. 63-64.)

In the ALJ's second hypothetical, the VE was asked to consider a hypothetical individual with the limitations from the first hypothetical and the following additional limitations: the individual could understand, remember, and carry out simple, routine repetitive tasks performed in a work environment free of fast-paced production requirements such as working on an assembly line and that involves only simple work-related decisions and routine workplace changes; and the individual could have occasional interaction with the general public, supervisors, and coworkers.  (Tr. 64-65.)  The VE testified that such an individual could not perform Ms. Skibski's past work but could perform representative positions in the national economy such as: marker, inspector and hand packager, and collator operator.  (Tr. 65.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her November 16, 2022, decision, the ALJ made the following findings:[3]

---

[3] The ALJ's findings are summarized.

13

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2017.  (Tr. 21.)

2.    The claimant engaged in substantial gainful activity during the period from her alleged onset date of December 1, 2016, through her date last insured of June 30, 2017.[4]  (*Id*.)

3.    The claimant had the following severe impairments through the date last insured: atrial fibrillation, congestive heart failure, mitral valve regurgitation, obesity, and venous insufficiency.  (*Id*.)  The claimant had the following non-severe impairments: obstructive sleep apnea, hypertension, adjustment disorder with mixed anxiety and depressed mood.  (Tr. 21-23.)

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 23-24.)

5.    Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl; she can have occasional concentrated exposure to extreme cold, heat, humidity, and wetness as well as occasional exposure to concentrated levels of dust, fumes, odors, gases, poor ventilation, and other pulmonary irritants; she cannot work around unprotected heights or dangerous moving machinery; and she cannot operate heavy equipment or dangerous machinery.  (Tr. 24-27.)

6.    Through the date last insured, the claimant was capable of performing past relevant work as a teacher aide II.  (Tr. 27-28.)

7.    Even if the work as a teacher aide II was not determined to be past relevant work, from October 1, 2016, through the date last insured of June 30, 2017, considering claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant can perform, including marker, inspector and hand packager, and office helper.  (Tr. 28-29.)

Based on the foregoing, the ALJ found Ms. Skibski was not under a disability from

December 1, 2016, the alleged onset date, through June 30, 2017, the date last insured.  (Tr. 29.)

---

[4] The ALJ proceeded with the sequential evaluation and did not deny Ms. Skibski's application solely at this first step of the sequential evaluation.  (Tr. 21.)

14

## V.     Plaintiff's Arguments

Ms. Skibski presents two arguments on appeal.  (ECF Doc. 8, pp. 1, 12-18; ECF Doc. 12, pp. 1-5.)  First, she argues that the ALJ failed to properly develop the record when she did not recontact the psychological consultative examiner for his opinion as to the onset date for the disabling mental limitations he assessed.  (ECF Doc. 8, pp. 1, 12-14; ECF Doc. 12, pp. 1-4.)  Second, she argues that the ALJ erred in evaluating her subjective allegations.  (ECF Doc. 8, pp. 1, 14-18; ECF Doc. 12, pp. 4-5.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing

42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Met Her Duty to Develop the Record**

In her first assignment of error, Ms. Skibski argues that the ALJ failed to properly develop the record because she did not "recontact the consultative examiner" to request his opinion regarding the onset date for the mental limitations identified in his November 2021 psychological evaluation.  (ECF Doc. 8, pp. 1, 12-14; ECF Doc. 12, pp. 1-4.)  The Commissioner

argues that the ALJ did not have a duty to recontact the consultative examiner and did not

commit legal error.  (ECF Doc. 11, pp. 7-11.)

The ALJ found Dr. Watkins's assessment of Ms. Skibski's mental functioning—based on

his November 2021 in-person examination—was not persuasive, explaining:

> Daniel Watkins, Ph.D., saw the claimant for a consultative examination on
> November 21, 2021. (Ex. B5F). The undersigned has considered this opinion and
> finds that it is not persuasive. This examination took place more than four years
> after the expiration of the claimant's date last insured, in June 2017. The opinion in
> this case is based upon the claimant's functioning in November 2021, and not
> during the period at issue. Therefore, this evidence in not germane to the issue in
> this case; whether the claimant is disabled under sections 216(i) and 223(d) of the
> Social Security Act through June 30, 2017, the last date insured.

(Tr. 27 (citing Tr. 689-97).)  Ms. Skibski acknowledges that "it was clearly within the discretion

of the ALJ to find that the report, as it stood, did not relate back to the period at issue," but

argues that Dr. Watkins's 2021 report "invoked the ALJ's duty to further develop the record by

recontacting Dr. Watkins to obtain his opinion regarding the onset of the disabling mental

restrictions which he assessed."  (ECF Doc. 8, p. 13.)  In her reply brief, she further asserts that

the state agency must have originally intended to obtain Dr. Watkins's opinion as to Ms.

Skibski's mental limitations in 2017 but "inadvertently omitted the need for an opinion as to the

longitudinal picture of [her] mental impairment," since there was no reason for Dr. Watkins to

"quantify a current level of restriction" for her DIB claim.  (ECF Doc. 12, pp. 1-2.)

The Commissioner argues that Ms. Skibski's arguments must fail because: (1) her

representative did not ask the ALJ to recontact Dr. Watkins (ECF Doc. 11, p. 8); (2) the

Commissioner's duty to develop the record applied only to the 12-month period prior to Ms.

Skibski's June 2017 date last insured, or earlier (*id.* (citing 20 CFR § 404.1512(b)(ii)); and (3)

any decision by the ALJ to seek a medical opinion regarding an established onset date "is always

at the ALJ's discretion" (*id.* at p. 9 (quoting Social Security Ruling 18-01p, 83 Fed. Reg. 49613

(Oct. 2, 2018))).  The Commissioner further argues that there was no reason for the ALJ to exercise her discretion to ask the consultative examiner whether the mental limitations identified in his 2021 examination report dated back to 2017 because the medical evidence from 2017 showed Ms. Skibski "denied mental health symptoms, had no mental health treatment, and had normal mental status findings" so that "no objective evidence in the record from the period at issue . . . would be consistent with" an opinion finding her 2021 limitations dated back to 2017. (*Id.* at pp. 9-10.)  The Commissioner also notes that the lack of objective medical evidence demonstrating mental limitations in 2017 is bolstered by the ALJ's additional finding that Ms. Watkins engaged in substantial gainful activity as a substitute teacher in 2017.  (*Id.* at p. 10.)

In addition to arguing that the specific circumstances underlying the state agency's ordering of a consultative examination "invoked" the ALJ's duty to further develop the record, Ms. Skibski also argues more generally that the ALJ erred in failing to seek an additional medical opinion because "the record lack[ed] a medical opinion of [her] mental capabilities from *any* medical source addressing the period at issue. . . ."  (ECF Doc. 8, p. 13 (emphasis in original).)  The Commissioner argues in response that this argument "is inconsistent with the Commissioner's regulations and policy."  (ECF Doc. 11, p. 10.)

For the reasons set forth below, the undersigned finds Ms. Skibski has not met her burden to show that the ALJ failed in her duty to develop the record or otherwise committed legal error.

### 1.    Whether Circumstances Created a Duty to Further Develop the Record

The undersigned turns first to the question whether the circumstances of the case—specifically, the state agency ordering a psychological consultative examination for a DIB benefits application with a remote date last insured in 2017—obligated the ALJ to ask the consultative examiner to give his medical opinion as to Plaintiff's mental limitations in 2017.

18

The Commissioner's duty to develop the record begins at the administrative level, before any request for a hearing before an ALJ. The Commissioner must make "every reasonable effort" to develop the medical evidence in support of an application for disability benefits, including "help[ing]" claimants get medical evidence from their own medical sources and "arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1512(b)(1); 20 C.F.R. § 404.1545(a)(3). The "complete medical history" to be developed by the Commissioner includes the 12-month period preceding the application and, where disability insurance benefits are sought, the 12-month period preceding the date last insured. 20 C.F.R. § 404.1512(b)(1)(ii).

At the hearing level, after benefits have been denied by the state agency on initial review and reconsideration, an ALJ must act "as an examiner charged with developing the facts" and ensure that every claimant receives a full and fair hearing. *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 411 (1971)). But "while the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (quoting *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); citing 20 C.F.R. § 404.1512(a)), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); *see also Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); 20 C.F.R. § 404.1512(a)(1) ("[Y]ou have to prove to us that you are blind or disabled."); 20 C.F.R. § 404.1545(a)(3) ("[Y]ou are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").

In special circumstances, the Sixth Circuit has held that an ALJ must "exercise a heightened level of care" in developing the record. *Lashley*, 708 F.2d at 1051–52. Heightened care applies to unrepresented claimants who are unfamiliar with hearing procedures and

incapable of presenting an effective case. *See Wilson*, 280 F. App'x at 459 (citing *Lashley*, 708 F.2d at 1051–1052); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing *Duncan*, 801 F.2d at 856). It does not apply to unrepresented claimants who demonstrate a grasp of the proceedings and adequately present their cases, *see Moats*, 42 F.4th at 564; *Wilson*, 280 F. App'x at 459, or to claimants who are represented by counsel, *see Stevenson v. Kijakazi*, No. 5:20CV2688, 2022 WL 4551590, at *13 (N.D. Ohio Sept. 29, 2022).

Here, where the Plaintiff was represented by counsel throughout the pendency of her application, the ALJ was not required to exercise a heightened level of care in developing the record. (Tr. 18, 43, 103-07, 249, 265, 273, 312-20.) Indeed, Ms. Skibski does not argue that she was entitled to heightened care. Instead, she argues the ALJ was obliged to seek an additional opinion from the consultative examiner—potentially relating his opinion regarding her functioning in 2021 back to the 2017 date last insured—because "[t]here was no reason for the agency to request that [the consultative examiner] quantify a current level of restriction. . . ." (ECF Doc. 12, p. 2.) She speculates that "the State agency intended to obtain Dr. Watkins' opinion as to mental restrictions applicable to the period at issue, but his instructions inadvertently omitted the need for an opinion as to the longitudinal picture of [her] mental impairment." (*Id.*) These arguments lack supporting authority and are not consistent with the underlying facts or applicable law.

As discussed above, the state agency was required to develop a "complete medical history" that included the records from Ms. Skibski's medical sources for the 12-month period preceding her April 2021 application for benefits *and* the 12-month period preceding her June 2017 date last insured. 20 C.F.R. § 404.1512(b)(1)(ii). Both periods are relevant to her DIB application. To obtain an award of benefits, she was required to establish her disability prior to

20

her 2017 date last insured.  20 C.F.R. § 404.131(a).  But to obtain an award of full benefits, rather than a closed period of benefits, she was also required to establish that any disability continued through her 2021 application date.  *See Turk v. Comm'r of Soc. Sec.*, 647 F. App'x 638, 641 (6th Cir. 2016) ("A claimant no longer qualifying as disabled may be entitled to benefits if she previously suffered a disability for a continuing, twelve-month period.") (citations omitted); *see also* 20 C.F.C. § 404.320 (governing entitlement to a period of disability).

The mere fact that the state agency ordered a consultative examination does not establish that the agency sought a retrospective medical opinion regarding Ms. Skibski's functioning in 2017, or that an opinion regarding her prior functioning was either necessary or appropriate.  The consultative examiner's opinion regarding Ms. Skibski's functioning in 2021 was germane to her continued entitlement to benefits in 2021, even if the ALJ found it was not germane to her functioning in 2017.  Ms. Skibski has not shown that the Commissioner erred in ordering a consultative examination without requesting an opinion as to her limitations in 2017.

Ultimately, the Sixth Circuit has explained that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001).  "[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant [her] the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); *see also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not necessarily "require the ALJ to order a consultative examination").  The regulations indicate that a consultative examination may be appropriate "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," where such evidence is not

contained in a medical source's records or where the medical source's evidence "cannot be obtained for reasons beyond [the claimant's] control." 20 C.F.R. § 404.1519a(b). Under these regulations, Ms. Skibski has not shown that the ALJ violated her duty to develop the record when she did not seek an additional medical opinion from the consultative examiner.

Indeed, the Commissioner argues that there was no reason for the ALJ to use her discretion to order a second report from the consultative examiner given that the contemporaneous medical evidence prior to the June 2017 date last insured showing Ms. Skibski "denied mental health symptoms, had no mental health treatment, and had normal mental status findings." (ECF Doc. 11, p. 9.) Ms. Skibski does not challenge this description of the contemporaneous medical records (ECF Doc. 12), and an independent review of the evidence is consistent with the Commissioner's description. There is no evidence that Ms. Skibski was undergoing mental health treatment during the relevant period, and the medical treatment records for that time recorded a normal mood and affect and her denial of symptoms of depression, anxiety, mood swings, or memory problems. (Tr. 22, 418, 582, 636, 639, 642, 905.) The ALJ discussed this evidence in finding Ms. Skibski's mental impairments to be nonsevere, explaining:

> At the hearing, the claimant testified that she had issues with her mood, as well as her ability to focus and concentrate. These allegations are not consistent with the medical evidence in the file. The claimant further testified that she had no trouble dealing with her students, or other teachers, in 2017, and she handled her own financial matters. Additionally, she testified that she saw family and friends during the period from December 1, 2016, through June 30, 2017. The record does not contain evidence of mental health treatment during the period at issue. On January 22, 2017, the claimant was seen at St. Anne's Hospital with shortness of breath and chest pain. [] Physical examination found a normal mood and affect, and normal behavior. [] Lynn Blakeslee, NP-C, saw the claimant on June 15, 2016, and she denied anxiety or depression. [] Four months later, in October 2016, Ghiath Yazji, M.D., saw the claimant and she again denied depression or anxiety. [] Dean Bernardo, M.D., saw the claimant on October 25, 2016, and she denied anxiety, depression, mood swings, or any psychiatric condition. [] In April 2017, the claimant was seen by Ms. Blakeslee, NP-C, and she denied difficulty with her memory. [] Despite the lack of specific treatment in the record prior to the date last insured and

> her denial of symptoms in the above records, the undersigned finds that adjustment disorder with mixed anxiety and depressed mood is still a medically determinable impairment, given the prior ALJ as well as the claimant's testimony at the hearing. However, as she denied symptoms, the undersigned concludes that this impairment is non-severe.

(Tr. 22 (citations omitted).)  The ALJ also acknowledged the opinions of the state agency psychological consultants that the record failed to establish any psychological medically determinable impairments during the relevant time period, but concluded based on the findings in a prior ALJ decision that Ms. Skibski's mental impairments were medically determinable. (Tr. 22.)  Nevertheless, the ALJ found those impairments nonsevere for the reasons articulated above, in particular "the lack of treatment during the period at issue."  (*Id.*)

Given the lack of contemporaneous objective medical evidence consistent with more than minimal mental limitations in 2017, the record does not support a finding that the ALJ had a duty to seek a retrospective medical opinion from the consultative examiner regarding Ms. Skibski's mental limitations in 2017.  *See Stark v. Comm'r of Soc. Sec.*, No. 5:15 CV 477, 2016 WL 1077100, at *6 (N.D. Ohio Mar. 18, 2016) (explaining: "to be given significant weight, [a] retrospective opinion must be supported by relevant, objective evidence that was contemporaneous to the insured period") (citing *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994)). Ms. Skibski's participation in work activity at substantial gainful activity levels in 2017 (Tr. 21) further supports a finding that the ALJ did not have a duty to seek additional opinion evidence.

For the reasons set forth above, the undersigned finds Ms. Skibski has not met her burden to show that the circumstances of this case created a duty for the ALJ to "recontact" the consultative examiner and request an opinion regarding the onset date for the mental limitations outlined in the November 2021 consultative examination report.

### 2.      Whether Absence of Medical Opinion Created a Duty to Develop the Record

The undersigned next turns to Ms. Skibski's argument that the ALJ erred when she did

not seek an additional medical opinion regarding Ms. Skibski's mental functioning in 2017

because "the record lack[ed] a medical opinion of [her] mental capabilities from *any* medical

source addressing the period at issue. . . ."  (ECF Doc. 8, p. 13 (emphasis in original).)  In

support of this argument, Ms. Skibski cites a district court decision holding: "Where a 'critical

body' of the 'objective medical evidence' is not accounted for by a medical opinion and there is

significant evidence of potentially disabling conditions, the ALJ should develop the record by

obtaining opinion evidence that accounts for the entire relevant period."  (ECF Doc. 8, pp. 13-14

(quoting *Phelps v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-02295 02295-BYP, 2022 WL

18395824, at *8 (N.D. Ohio Nov. 15, 2022), *report and recommendation adopted*, No. 1:21-CV-

2295, 2023 WL 316016 (N.D. Ohio Jan. 18, 2023).)  The Commissioner responds that Ms.

Skibski's argument is "inconsistent with the Commissioner's regulations and policy" and "has

been rejected by numerous courts, including the Sixth Circuit."  (ECF Doc. 11, p. 10 (citing

*Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).)

The legal standard on which Ms. Skibski relies was first articulated in *Deskin v. Comm'r*

*of Soc. Sec.,* 605 F. Supp. 2d 908 (N.D. Ohio Mar. 31, 2008), a 2008 district court decision that

sought to articulate a "general rule" for when ALJs should seek additional medical opinion

evidence.  *Phelps*, 2022 WL 18395824, at * 10 (discussing *Deskin* rule).  The *Deskin* judge

revisited the standard in *Kizys v. Comm'r of Soc. Sec.*, where he clarified that *Deskin* states "a

narrow rule that does not constitute a bright-line test."  No. 3:10 CV 25, 2011 WL 5024866, at

*1–2 (N.D. Ohio Oct. 21, 2011).  Both decisions argue that an ALJ should obtain additional

medical opinions when: (1) there is *no* medical source opinion in evidence; or (2) the only

opinion in evidence is an "outdated" opinion from a non-examining source (like a state agency consultant).  *Kizys*, 2011 WL 5024866 at *2 (citing *Deskin*, 605 F. Supp. 2d at 912).

But *Deskin* is not binding authority and several courts in this District have criticized or declined to follow the *Deskin* standard.  *See, e.g.*, *Carr v. Comm'r of Soc. Sec.*, No. 5:23-CV-00187, 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024); *Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-01793, 2023 WL 7622634, *4 (N.D. Ohio November 15, 2023); *Davidson v. Comm'r of Soc. Sec.*, No. 3:22CV938, 2023 WL 5948122, *4 (N.D. Ohio Sept. 13, 2023) (citing *Van Pelt*, 2020 WL 7769729, at *10–11); *Adams v. Colvin,* No. 1:14CV2097, 2015 WL 4661512, at *15 (N.D. Ohio Aug. 5, 2015) (collecting cases); *Williams v. Astrue*, No. 1:11-CV-2569, 2012 WL 3586962, at *7 (N.D. Ohio Aug. 20, 2012).  The court in *Williams* held that "*Deskin* 'is not representative of the law established by the legislature, and [as] interpreted by the Sixth Circuit Court of Appeals.'"  *Williams*, 2012 WL 3586962, at *7 (quoting *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010)) (brackets in original).  The court in *Winans* similarly explained:

> Deskin is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law. . . . By requiring an ALJ to secure a medical opinion whenever the record does not contain such an opinion, subject to only limited exceptions, Deskin places a higher burden on the ALJ than the Sixth Circuit does.

*Winans*, 2023 WL 7622634, *4 (citations omitted).  The undersigned agrees.

The decisions rejecting *Deskin* and *Kizys* are consistent with the governing regulations, which provide simply that an ALJ "may" order a consultative exam if the medical record is insufficient.  20 C.F.R. § 404.1512(b)(2); *see also* 20 C.F.R. § 404.1517 and 20 C.F.R. § 404.1545(a)(3).  The Sixth Circuit has confirmed that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster*, 279 F.3d at 355; *see also Landsaw*, 803 F.2d at 214; *Cox*, 615 F.App'x at 263.  Similarly,

where an ALJ must infer when a claimant first became disabled, Social Security Ruling 18-1p

establishes that the ALJ "may" request testimony or interrogatory responses from a medical

expert, but specifies that: "The decision to call on the services of an ME *is always at the ALJ's*

*discretion*. Neither the claimant nor his or her representative can require an ALJ to call on the

services of an ME to assist in inferring the date that the claimant first met the statutory definition

of disability."  SSR 18-01p, 83 Fed. Reg. 49613, 49616 (emphasis added).

The decisions rejecting *Deskin* and *Kizys* are also consistent with the Sixth Circuit's

finding in *Mokbel-Aljahmi* that an ALJ was not "required to get the opinion of another physician

before setting the residual functional capacity," despite giving no weight to the other opinions in

evidence, since the Sixth Circuit had "previously rejected the argument that a residual functional

capacity determination cannot be supported by substantial evidence unless a physician offers an

opinion consistent with that of the ALJ."  732 F. App'x at 401–02 (citing *Shepard v. Comm'r of*

*Soc. Sec.*, 705 F. App'x 435, 442–43 (6th Cir. 2017) and *Rudd v. Comm'r of Soc. Sec.*, 531 F.

App'x 719, 728 (6th Cir. 2013)).  More recently, the Sixth Circuit rejected a similar argument

"that an ALJ may not make a work-capacity finding without a medical opinion that reaches the

same conclusion," explaining that "[t]he effect of a claimant's conditions on her ability to work .

. . is a determination expressly reserved for the ALJ."  *Reinartz v. Comm'r of Soc. Sec.*, 795 F.

App'x 448, 449 (6th Cir. 2020) (citations omitted).

Ms. Skibski's argument that the ALJ was obligated to request additional medical opinion

evidence merely because "the record lacks a medical opinion of [her] mental capabilities from

*any* medical source addressing the period at issue" (ECF Doc. 8, p. 13) is not supported by the

regulations or Sixth Circuit precedent.  The ALJ was tasked with determining Ms. Skibski's RFC

based on all the relevant evidence in the record, and "d[id] not improperly assume the role of a

medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see* 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 404.1546(c).  She had discretion to determine whether additional medical opinion evidence was warranted.  *See* 20 C.F.R. § 404.1512(b)(2); *Foster*, 279 F.3d at 355; SSR 18-01p, 83 Fed. Reg. 49613.

Pursuant to the above authority, the ALJ concluded that Ms. Skibski had no more than mild limitations in mental functioning, and thus no more than minimal limitations in her ability to perform basic work activities, and explained how she considered the available evidence to reach that finding.  (Tr. 22-23.)  In particular, the ALJ highlighted Ms. Skibski's lack of mental health treatment and denial of associated symptoms during the relevant period.  (Tr. 22.)  Given the supporting evidence and explanations from the ALJ, the undersigned finds Ms. Skibski has not met her burden to show that the ALJ's assessment of her mental limitations lacked the support of substantial evidence or that the ALJ had a duty to seek out further medical opinion evidence.  Indeed, it is questionable that additional opinion evidence from the consultative examiner would have been probative of Ms. Skibski's functioning in 2017, given the lack of contemporaneous objective medical evidence regarding her mental limitations in 2017.  *See Strong*, 88 F. App'x at 845 ("Evidence of disability obtained after the expiration of insured status is generally of little probative value." (citing *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n. 6 (6th Cir.1988)).

The above analysis would not change even if the *Deskin/Kizys* standard were applied to require a new medical opinion where "a 'critical body' of the 'objective medical evidence' is not accounted for by a medical opinion."  *Phelps*, 2022 WL 18395824, *9.  The state agency psychological consultants reviewed the objective medical evidence preceding the 2017 date last

insured and found insufficient evidence to establish even a medically determinable mental impairment, let alone to support a finding of more than minimal mental limitations resulting from any such impairment.  (Tr. 89, 97.)  Thus, even if the *Deskin/Kizys* standard were found applicable in this case, that standard would not support a finding that the ALJ erred when she did not seek retrospective medical opinion evidence from the consultative examiner.

For the reasons explained above, the undersigned concludes that Ms. Skibski has not shown that the ALJ erred when she did not "recontact" the consultative examiner or seek testimony from a medical expert.  Accordingly, the undersigned finds the first assignment of error is without merit.

**C.     Second Assignment of Error: Whether ALJ Properly Considered Subjective Allegations**

In her second assignment of error, Ms. Skibski argues that the ALJ erred in her evaluation of her subjective allegations.  (ECF Doc. 8, pp. 1, 14-18; ECF Doc. 12, pp. 4-5.)  She asserts that the ALJ failed to adequately explain why she rejected Ms. Skibski's allegations "that she was only able to lift ten to fifteen pounds, only able to walk a couple yards before she had to stop and rest for two to three minutes, had difficulty with stairs, felt unbalanced while walking, and had difficulty picking something off the ground."  (ECF Doc. 8, p. 15.)  She contends the ALJ "failed to explain how [Ms. Skibski's] testimony [was] inconsistent with the other evidence, and he never bridge[d] the gap between the restrictions which Plaintiff described and the finding that those limitations '[were] not entirely consistent with the medical evidence.'"  (*Id*. at p. 16 (quoting Tr. 26).)  The Commissioner argues that the ALJ properly considered Ms. Skibski's subjective allegations in light of the entirety of the record.  (ECF Doc. 11, pp. 11-16.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable

impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  Relevant factors included daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

Here, the ALJ considered Ms. Skibski's allegations that: "she was able to lift ten to fifteen pounds, she was able to walk a couple yards before she had to stop and rest for two to three minutes, and she had difficulty with stairs"; she "felt unbalanced" and "had issues picking something off the ground"; and "her medications caused coughing and caused her to feel woozy."  (Tr. 25.)  She found that Ms. Skibski's "medically determinable impairments could reasonably be expected to cause *some* of the alleged symptoms," but concluded that Ms. Skibski's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 26 (emphasis added).)

Ms. Skibski asserts that the ALJ summarized medical evidence but did not identify inconsistencies between Ms. Skibski's testimony and the evidence of record and did not explain how her testimony was rejected.  (ECF Doc. 8, p. 16.)  The undersigned finds Ms. Skibski's argument without merit.  The ALJ's analysis was not boilerplate.  She provided a clear and

logical explanation for finding Ms. Skibski's subjective allegations not entirely consistent with the evidence of record.  (Tr. 26.)  She explained:

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because they are not supported by the evidence in the file. At the hearing, the claimant testified that she was only able to walk a couple of yards before she had to stop for two to three minutes. This is not supported by the evidence in the file. In April 2017, Lynn Blakeslee, NP-C, saw the claimant and she reported that she was able to walk a quarter-mile to a mile per day, without symptoms. (Ex. B4F pg. 23). This suggests that her symptoms were not as disabling as she alleged.  However, echocardiogram testing, performed in October 2016, noted moderate-to-severe impairment of her left ventricular systolic function, with an ejection fraction of thirty to thirty-five percent, as well as moderate mitral regurgitation. (Ex. B4F pg. 37). This supports some issues moving and the undersigned has accounted for this by limiting the claimant to work at the light exertional level, with no climbing ladders, ropes, or scaffolds, only occasional climbing of ramps and stairs, and occasional balancing, kneeling, stooping, crouching, and crawling.
>
> Additionally, the claimant testified that her medications caused coughing and a woozy feeling, however this is not consistent with the medical records. The treatment records in the file from December 2016, through June 2017, do not mention side effects from the claimant's medications. Specifically, in October 2016, and April 2017, the claimant denied syncope or dizziness. (Ex. B4F pgs. 23, 26). This suggests that her symptoms were not as severe as she alleged. Moreover, the claimant testified that, during the period at issue, she was only able to lift ten to fifteen pounds. this is not supported by the medical records. In October 2016, the claimant saw Dr. Yazji and he noted good muscle strength. (Ex. B4F pg. 26). On January 22, 2017, the claimant was seen at St. Anne's Hospital and her examination demonstrated no respiratory distress, normal heart rate and rhythm, a normal mood and affect, and normal behavior. (Ex. B2F pg. 83). X-rays at that time showed mild perihilar vascular prominence and cardiomegaly. (Ex. B2F pg. 177). These findings suggest that the claimant's ability to lift was not as severe as she alleged. The undersigned does note that the claimant's treatment records have consistently noted 2+ edema in her lower extremities, and her echocardiogram revealed moderate-severe impairment of her left ventricular systolic function, with an ejection fraction of thirty to thirty-five percent. (Ex. B4F pg. 37). Moreover, chest x-rays from just after the date last insured found cardiomegaly with pulmonary venous congestion and perihilar edema, right-sided effusion, and decompensation of her congestive heart failure. (Ex. B2F pg. 164). These findings support limiting the claimant to work at the light exertional level, with no work around unprotected heights or dangerous moving machinery, and no operation of heavy equipment.

(*Id.* (emphasis added).) In addition to this clear and logical explanation regarding Ms. Skibski's testimony as to to her alleged limitations, the ALJ also observed that Ms. Skibski refused anticoagulation medication and her examination showed good muscle strength in October 2016 (Tr. 25, 639), and continued to indicate that she did not want to take anticoagulants and had not started to wear her compression stockings in April 2017 (Tr. 25, 636).

The ALJ also considered and found persuasive the opinions of the state agency medical consultants, who found that she had the residual functional capacity to: lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand and/or walk for 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and should avoid all exposure to hazards and concentrated exposures to extreme heat, extreme cold, wetness, humidity, fumes, odors, dusts, gases and poor ventilation. (Tr. 27, 90-92, 98-100.) She explained her reasoning for finding the opinions persuasive, stating:

> These opinions are consistent with, and supported by, the evidence in the file. [I]n January 2017, the claimant's physical exam revealed no respiratory distress, and a normal heart rate and rhythm. (Ex. B2F pg. 82). Chest-x-rays taken at that time found only mild perihilar vascular prominence and possible early congestive heart failure. (Ex. B2F pg. 177). This supports limiting the claimant to work at the light exertional level, with no concentrated exposure to pulmonary irritants. Echocardiogram testing, performed in October 2016, demonstrated moderate-severe impairment of her left ventricular systolic function, with an ejection fraction of thirty to thirty- five percent. (Ex. B4F pg. 37). This supports limiting the claimant to occasional balancing, stooping, kneeling, crouching, and crawling.

(Tr. 27.)

The ALJ was not required to "accept [her] subjective complaints." *Jones*, 336 F.3d at 476. Ms. Skibski has not met her burden to show how the ALJ's analysis of her subjective complaints failed to meet the regulatory standard. Nor has she shown that the ALJ failed to provide a reasoned rationale for finding Ms. Skibski's subjective allegations not entirely

consistent with the medical evidence and other evidence of record.  Ms. Skibski has not shown that the ALJ ignored evidence or that her findings lack the support of substantial evidence. Furthermore, the ALJ did not find that Ms. Skibski's subjective statements regarding her symptoms were wholly inconsistent with evidence of record or that her conditions resulted in no physical limitations.  (Tr. 24-27.)  The ALJ weighed the entirety of the evidence and credited Ms. Skibski's subjective allegations to the extent she found them supported by the record.

For the reasons set forth above, the undersigned finds the ALJ adequately considered the subjective allegations in the context of the record as a whole.  Accordingly, the undersigned finds Ms. Skibski's second assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

July 9, 2024

 */s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).